On the evening of February 24, 1944, Elmo Scott and his wife, Ethel Scott, arrived at the City of Houma on a bus from Baton Rouge and thereupon hired a taxicab to take them to their home in said city. As they entered the taxicab a returning war veteran named Isaac Stewart came to the cab and requested that he be taken to his home somewhat of the same neighborhood, and he was permitted to enter the cab for that purpose. It developed that Stewart was a returning disabled veteran, and the driver consequently stated that he would take Stewart home first and then proceeded toward the direction of Stewart's home, which was located on Naquin Street. Upon arriving in the intersection of Naquin Street and Hobson Street, the taxicab, which was proceeding south on Naquin Street, was struck by a truck which was proceeding cast on Hobson Street, and was pushed into an electric light post situated on the southeast corner of the intersection. The crash resulted in injuries to Elmo Scott and Ethel Scott, as well as damages to the taxicab and truck. The collision took place between 7 and 7:30 p.m., just before dark.
As a result of the injuries sustained by Ethel Scott, she filed suit against Luke Richard, Jr., the driver of the truck, a minor 16 years of age, and against his mother, Mrs. Luke Richard, Sr., and against Ernest Daigle, the driver of the taxi, and Nouga Babin, the owner of the taxi, alleging that her injuries were caused by the joint negligence of the taxi driver, who was acting in the course of his employment, and of the truck driver.
The negligence charged against the taxi driver is that he failed to stop at the intersection in accordance with the stop sign therein located, and in compliance with the city ordinances requiring such stop; that he was traveling in excess of 25 miles per hour in violation of the city ordinances and at an excessive rate of speed under the particular circumstances, and that he was failing to keep a proper lookout for other traffic.
The negligence charged to the truck driver, Luke Richard, Jr., is that he was driving at a rate of speed in excess of 40 miles per hour, in reckless abandonment and total disregard of all other traffic, and in violation of the traffic rules and regulations of the city.
It was also charged that neither vehicle had headlights burning or properly operating at the time of the accident, and that neither defendant signaled his approach to other outgoing traffic by blowing a horn.
Petitioner Ethel Scott alleges that as a result of this accident she received a fracture in her left pelvis bone and had to receive treatment therefor at Charity Hospital in New Orleans for a period of three days, and thereafter had to lie down on a *Page 177 
very uncomfortable bed at her home for a period of four weeks, without moving, and thereafter for some five or six weeks was able to move about slowly with the aid of a cane and even thereafter for some time after she laid aside her cane, she had to proceed cautiously and that during this whole period was suffering great pain, mental fear and anguish and discomfort, and she claims damages in the sum of $1,700, itemized (a) injury to the left hip and bones, $1,000, (b) physical pain and suffering, $500, (c) mental fear and anguish, $200.
The companion case of Elmo Scott recites the same allegations with reference to the happening of the accident, and he claims damages as follows:
a. 98 working days at $5.20 per day, time lost, making a to- tal of ...................... $ 509.60
b. Injury and damage to right leg caused by operation ......... 500.00
c. Injury and damages to left portion of chest and shoulder 2,000.00
d. Permanent injury to left chest and shoulder ................ 1,000.00
e. Physical pain and suffering ... 1,000.00
f. Mental pain and anguish ....... 500.00 -------- Total damages ............ $5,509.60
After trial of the case the District Judge reached the conclusion that the proximate cause of the accident was the negligence of the taxi driver and while admitting, according to his written opinion, that the truck driver was also negligent, he failed to find such negligence was the proximate cause of the accident, and accordingly he rendered judgment in favor of the two plaintiffs and against the defendants Ernest Daigle and Nouga Babin, awarding Ethel Scott the sum of $500, and awarding Elmo Scott the total sum of $1,459.60, covering $509.60 for loss of time, $200 for operation on his leg, and $500 for operation of his chest, and $250 for pain and anguish.
The defendants Nouga Babin and Ernest Daigle filed an appeal from the judgment against them which was answered by the two plaintiffs, in which answers they pray for increases of their respective awards to the amounts originally claimed.
The plaintiffs filed an appeal on that part of the judgment dismissing the suit as to Mrs. Luke Richard, Sr., and her minor son, Luke Richard, Jr.
[1] A review of this lengthy transcript shows that the following facts are undisputed or supported by a preponderance of the evidence.
Ernest Daigle, driving a cab belonging to Nouga Babin, arrived at the intersection of Naquin and Hobson Streets, driving in a southerly direction at about some time between 7 and 7:30, just before dark, and he entered said intersection, which, on the west side of Naquin Street, was hidden from view by hedges to a point some 7 1/2 feet from Hubson Street, without any signal whatsoever and without stopping. As to whether or not he stopped, we have some contradiction in the evidence. He testifies that he did stop, and a Mrs. Portier, who lived at the time on the south side of Hobson Street, about 30 feet west of Naquin Street, testified that she was sitting at her front door, expecting her brother, who also drove one of Babin's taxis, for dinner, and that when this Babin taxi arrived at the intersection, it stopped, and she looked to ascertain whether or not the driver was her brother, and being satisfied he was not, she paid no more attention to the cab. The trial judge concluded that since she was not even aroused by the crash, which occurred some two seconds later, he felt that her testimony with reference to Daigle having made a stop at the corner was fabricated. Moreover, Daigle himself, in his testimony, estimated that he merely stopped a matter of two seconds, and there is some doubt that she could have determined, at dusk, within that time that he was not her brother. The testimony of Daigle and Mrs. Portier is flatly contradicted by the three passengers in Daigle's car, to-wit: Elmo Scott, his wife, Ethel Scott, and Isaac Stewart. It is also conclusively shown by the testimony of the three taxicab passengers that at the time of entering the intersection Daigle was driving at a "pretty good speed", which, as the trial judge states, indicates that he was going rather fast, at least in considerabe excess of the 20 to 23 miles per hour Daigle states he was traveling. In addition to the testimony of the three passengers as to his speed we also have the testimony of a disinterested party, to-wit, Mrs. Marcus Lirette, who lived on the west side of Naquin Street, some 450 feet from Hobson Street, who stated that she caused one of her elderly children to prevent one of her younger children from entering the street when the Babin taxicab came by her house traveling at a fast speed. Of course, when she saw the cab it was still some 450 feet from *Page 178 
the intersection, but from the tenor of her testimony, especially of the fact that she heard the crash and went to the wreck just a moment after, it is apparent that Daigle slackened his speed very little, if any, at the intersection.
From the above it seems clear that Daigle was guilty of negligence, at least in three particulars, that is, in driving his cab at an unreasonable rate of speed, in failing to make a stop at Hobson Avenue, in accordance with the stop sign thereon, and in failing to keep a proper lookout, especially at this blind corner.
In so far as Luke Richard, Jr., is concerned, the preponderance of the evidence shows that he was driving the truck belonging to John Edward Le-Blanc, without LeBlanc's permission, going in an easterly direction on Hobson Street, at a rate of speed of from 40 to 50 miles per hour, and without lights. Luke Richard admits that he told LeBlanc some time after the wreck that he was driving about 30 to 35, but we have the testimony of Officer John Bergeron to the effect that Luke told him that he was driving at about 40 miles per hour, and the testimony of LeBlanc and Harold Domangue to the effect that Luke told LeBlanc at the police station that he was driving between 40 and 50 miles per hour. Moreover, Luke himself stated that he did not slow down at all until within about eight feet of the intersection, and that he did not see the taxi until he was within 18 inches thereof. The fact that he did not see this taxi, which, according to the preponderance of the evidence, had its headlights burning, and had already at least partially entered the intersection, until he was right on it indicates that he was driving at an excessive rate of speed and that he was not keeping a proper lookout. Moreover, the preponderance of the evidence is to the effect that for safe driving at the time of the accident it was proper to have the lights of vehicles turned on.
From the above it is clear that Luke Richard, Jr., was guilty of negligence in at least three respects, namely, that he was driving at an excessive rate of speed, that he was not keeping a proper lookout, and that he was driving without his lights burning just before dark.
The trial judge found, on the question of liability, that Luke was negligent, but failed to conclude that such negligence was a proximate cause of the accident. It would seem to us that in spite of the negligence of the taxi driver, if Luke had been driving as he should, with his lights burning, he would have perceived the taxicab and would not have run into it. And, also, if the taxi driver had been driving as he should, and would have stopped at the through street and looked as he should he would not have entered the intersection until after the truck had passed and the accident would not have happened. In other words, it is our opinion that the negligence of the taxi driver and the negligence of the truck driver both contributed to this accident. Certainly, if the taxi driver and taxi owner would sue the truck driver and his mother, the case would have to be dismissed because of the contributory negligence of the taxi driver, and similarly, if the mother of the truck driver brought suit in his behalf for any possible injury, again the suit would have to be dismissed because of the truck driver's contributory negligence.
[2] In so far as any negligence on the part of the plaintiffs, who were passengers in the taxicab, is concerned, it is very obvious from the evidence that they were strangers in that particular neighborhood and that they had neither the time nor any other reason to warn their driver of any impending danger and hence, as brought out by the trial judge, they cannot be charged with any negligence whatsoever.
Therefore, the judgment of the lower court must be amended on the question of liability so as to grant judgment for the plaintiffs against all the defendants, based on the proposition that both the taxi driver and the truck driver were guilty of negligence contributing to the accident by which plaintiffs were injured.
[3] In so far as the quantum of damages is concerned, in the case of Ethel Scott, the proof establishes her allegations that she sustained a fracture of her left pelvis bone, that she was treated for three days in Charity Hospital, and that thereafter spent some four weeks on a hard bed, after which she was able to get along with a cane, which she disposed of in about five or six weeks. It does not appear that the fracture was serious, since no setting thereof was necessary, and no cast had to be applied, but no doubt she suffered discomfort for some 9 or 10 weeks, especially during the time that she was in bed. No doubt too she might have had some slight fear as to the outcome of her injury, *Page 179 
although she seems to have been assured by her physician that if she followed instructions she would be all right. We find the award of $500 in her case to be fair.
[4, 5] With reference to the quantum of damages in the case of Elmo Scott, it is shown that he was knocked practically unconscious in the accident and that he sustained a sterno-clavicular separation of his left side and was bruised and lacerated on various parts of his body; that he was taken to Charity Hospital in New Orleans where he was confined from February 25, 1944, until March 30, 1944; that he was operated on for his sterno-clavicular separation, the operation consisting of the removal of a bone sliver and tissue from his right leg and the attaching of the separation with this bone and tissue, the operating procedure being known as an open reduction. After his discharge on March 30, it appears that the patient was confined to his home until May 29, 1944, when he attempted to work, but was unable to do so. Finally, on or about June 17, 1944, he was able to return to work, although he continued to feel some discomfort from his left shoulder. However, according to the medical testimony by that time he had recovered sufficiently to do practically the same work he had done before his injury, and although even at the time of trial he did not have the same extension in his left arm as in his right, the medical opinion is to the effect that the difference was so slight as not to interfere in his ability to work and that eventually, by working the left arm and shoulder, they will regain their original capacity. The trial judge gave Elmo Scott $509.60 for time lost as a result of his injury, which is the amount claimed, and which is proved sufficiently. He gave him $200 for the operation on his leg, and $500 for the operation on his chest. The leg operation, according to the medical testimony, was very slight and practically healed in five or six days, with no resulting injury. The chest operation was serious, but was successful and no permanent disabling condition appears to have remained. The trial judge then gave an additional $250 for pain and anguish. Apparently the last three items are elements of pain and anguish amounting to $950. Since there was not any cost for the operations, we feel that this award should be increased by $300, for the reason that this man undoubtedly suffered severe pain at the time of the accident and for hours thereafter, and suffered some pain and much discomfort and considerable mental anguish (due to the fact that he must have had fear as to his eventual ability to return to work) as a result of his operation.
Separate decrees will be rendered in accordance herewith.